UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Bronwyn Dougherty–Noteboom,

                            Plaintiff,

        v.

Nancy A. Berryhill, Acting Commissioner
of Social Security,

                           Defendant.

**Decision and Order**

17-CV-00243-HBS

(Consent)

## I.    Introduction

This action is brought pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3) to review the final determination of defendant, Commissioner of Social Security, that plaintiff is not disabled and, therefore, is not entitled to disability insurance benefits ("DIB") and/or Supplemental Security Income Benefits ("SSI"). Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the parties filed cross motions for judgment on the pleadings. Dkt. Nos. 13, 16.

The Court has deemed the motions submitted on papers under Rule 78(b). For the reasons set forth in this opinion, plaintiff's motion is DENIED and defendant's motion is GRANTED.[1]

## II.    Background

### A.    Procedural Background

On October 12, 2011, plaintiff Bronwyn Dougherty–Noteboom filed a Title II application for DIB. Tr. 134. On March 19, 2012, the Social Security Administration ("SSA") denied her claim. *Id*. Consequently, plaintiff filed a request for a hearing with an administrative law judge ("ALJ") to review her case. *Id*. After her hearing on March 28, 2013, the ALJ issued an

---

[1] The parties consented to Rule 73 jurisdiction on June 15, 2018.  Dkt. No. 17.

unfavorable decision, finding plaintiff not disabled. Tr. 145. Plaintiff then filed a request for review with the Appeals Council, who remanded the case back to the ALJ for further considerations. Tr. 151. After attending a second hearing, the ALJ issued another unfavorable decision on August 4, 2015. Tr. 5. The Appeals Council denied plaintiff's request for review regarding the second unfavorable decision. Tr. 1.

Having exhausted all administrative remedies, plaintiff filed a complaint with this Court on March 20, 2017. Dkt. No. 1. She alleges that the ALJ's August 4, 2015 decision was not supported by substantial evidence, warranting judgment in her favor or, alternatively, remand for further administrative proceedings. *Id*.

**B.    Factual Background**

Plaintiff was aged forty-four years at the alleged disability onset date. Tr. 21. She had past work experience as a supervisor at a mental health care facility and in customer service. Tr. 82–83. She graduated from high school. Tr. 266.

1.    Relevant Treatment Notes and Examinations

Plaintiff received primary care from Dr. Erika Connor. *See, e.g.,* Tr. 971–1009. Dr. Connor treated plaintiff for numerous conditions, including obesity, tobacco use, and acute infections. Tr. 992–93. Dr. Connor provided prescription medications for plaintiff, and frequently advised plaintiff to lose weight and stop smoking. Tr. 993, 996–97, 1003. On May 2, 2014, Dr. Connor opined that plaintiff's obesity contributed to her sleep apnea and daytime sleepiness, and again stressed that it was important for plaintiff to achieve weight loss. Tr. 1003. On May 8, 2013, Dr. Connor ordered a pulmonary function test for plaintiff. Tr. 1012. This test revealed that plaintiff had a mild restrictive ventilatory defect, which did not improve with the use of a bronchodilator. *Id*.

Plaintiff visited Southern Tier Arthritis & Rheumatism to receive treatment for her fibromyalgia. Tr. 1017. On June 19, 2012, plaintiff presented for an examination. *Id*. The Nurse Practitioner remarked that plaintiff was an "alert very dramatic . . . female who ambulates without any difficulty." *Id*. She further noted that plaintiff's "lack of consistent follow [up] and noncompliance" was an issue, and explained to plaintiff the need to follow up with her "assortment of physicians." Tr. 1018. Plaintiff's examinations at Southern Tier sometimes produced results consistent with fibromyalgia, including tenderness in areas typical of the condition. Tr. 1020, 1028. However, noncompliance continued to be an issue, as the Nurse Practitioner later noted in October 2012 that "due to her inconsistent followup here which likely carries over to her other healthcare providers it's difficult to get a good handle on adequate therapies." Tr. 1020.

Plaintiff received counseling at Jamestown Mental Hygiene to treat her mental health conditions. Tr. 778. In her initial assessment, plaintiff reported having suicidal ideations, but had not attempted to harm herself since 1995. Tr. 780. On December 12, 2011, plaintiff's mental health counselor indicated that she was alert, awake, and oriented in time, place and person. Tr. 788. He also indicated that suicidal ideations were not present. *Id*. Similar findings were consistently found in future appointments. Tr. 791, 794, 796–97, 936. On April 7, 2014, plaintiff's mental health counselor mentioned that plaintiff "always has a problem with her hygiene and grooming," and after discussing the issue she "does well for a couple of times but then goes back to the same behaviors." Tr. 1095.

2.      Medical Opinion Evidence

The record contains five medical source statements regarding plaintiff's residual functional capacity ("RFC").

On March 1, 2013, plaintiff's treating psychiatrist Dr. David Johnson issued a mental RFC assessment. Tr. 910. Using a standardized "checkbox" form, Dr. Johnson indicated several marked limitations related to psychiatric conditions, but did not provide explanations regarding the boxes checked. Tr. 913. Dr. Johnson further opined that he had not seen plaintiff recently, and that he was relying on "dated" clinical findings to make his assessment. Tr. 913–14.

On May 2, 2011, plaintiff received a psychiatric consultative examination from Dr. Sandra Jensen. Tr. 364. Upon examination, Dr. Jensen noted a neutral mood and full range of affect. Tr. 366. Plaintiff's insight and judgment were fair, and attention and concentration were intact. *Id*. Dr. Jensen opined that plaintiff had mild-to-moderate limitations in adequately relating to others and dealing with stress, but that psychiatric problems do not appear to significantly interfere with her ability to function on a daily basis. Tr. 367.

Dr. Jensen completed a second psychiatric consultative examination on February 22, 2012. Tr. 690. In contrast to her May 2, 2011 statement, this medical source statement did not contain limitations regarding relating adequately with others and dealing with stress. Tr. 693. Dr. Jensen once again opined that psychiatric issues did not interfere with plaintiff's ability to function on a daily basis. *Id*.

On March 19, 2012, a state agency evaluator referred to only as "D. Mangold" completed a mental RFC assessment. Tr. 715. Mangold indicated that plaintiff would not be significantly limited in carrying out simple or short instructions, or in making simple work-related decisions. Tr. 715–16. He did not opine to any marked limitations. *Id*.

On February 22, 2012, plaintiff received a consultative internal medicine examination from Dr. Sandra Boehlert. Tr. 696. Plaintiff reported that she did not do any cooking, cleaning, or laundry, and that she only showered once per month. Tr. 697. Dr. Boehlert opined that

plaintiff "would benefit from having more adequate sleep as she may require a nap during the day due to her sleep apnea." Tr. 699. Dr. Boehlert further noted that plaintiff had a mild limitation regarding work requiring excellent visual acuity, but noted no further limitations.

### 3. Hearing Testimony

On March 26, 2015, ALJ Bruce Mazzarella conducted an administrative hearing with plaintiff, plaintiff's attorney, and a vocational expert. Tr. 74. The ALJ pursued a line of questioning regarding plaintiff's decision to collect unemployment insurance after being dismissed from her job. Tr. 85–86. When confronted with the ALJ's assertion that one has to certify an ability to work in order to collect unemployment, plaintiff admitted that she is "still feeling ready, willing, and able to work in some capacity." The ALJ also questioned plaintiff about her functional limitations. Tr. 106. When asked how much weight plaintiff could lift and carry, plaintiff indicated that she could lift and carry "the ten-pound cat" across the room. Tr. 106. Plaintiff also indicated she had difficulty breathing as a result of asthma and COPD. Tr. 99. In addition, plaintiff's attorney questioned plaintiff about her noncompliance with certain treatments and her failure to attend medical appointments. Tr. 113. Plaintiff explained that she stopped taking one of her medications because she forgot "why [she] was taking it." Tr. 113. She also stated that she missed appointments because winter weather wasn't "conducive" to driving to her appointments. Tr. 114.

In a function report form that plaintiff filled out prior to her hearing, plaintiff indicated that she was unable to climb stairs, kneel, or squat. Tr. 285. During plaintiff's hearing, the ALJ posed a hypothetical to the vocational expert involving a plaintiff who could only occasionally stoop, crouch, kneel, or climb stairs. Tr. 121.

4.      The ALJ's Decision

On August 4, 2015, the ALJ issued an unfavorable decision, finding the plaintiff not

disabled. Tr. 5. He determined that plaintiff had numerous severe impairments, including

obesity, fibromyalgia, sleep apnea, chronic obstructive pulmonary disease, asthma, iritis,

scleritis, PTSD, bipolar disorder, and chronic fatigue syndrome. Tr. 10. Before determining

whether plaintiff could still engage in substantial gainful activity, the ALJ determined plaintiff

had the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) except the individual should not stoop, crouch,
> kneel, or climb stairs in more than an occasional basis. The individual should not
> work in unventilated work areas that contain large concentrations of dusts, fumes
> gases and vapors. The individual is limited to simple, repetitive and routine tasks
> with only occasional contact with the public and fellow workers. The individual is
> not suited for work that requires constant very fine visual acuity.

Tr. 13–14. In calculating the RFC, the ALJ determined that plaintiff's allegations regarding her

symptoms were not fully credible. Tr. 20. He frequently made reference to plaintiff's poor

compliance with treatment while discussing the RFC. Tr. 15, 16–17, 20. The ALJ also discussed

each of the five medical opinions in the record. He assigned "little weight" to the opinion of Dr.

Johnson, as Dr. Johnson only saw plaintiff for a brief period. Tr. 19. He assigned weight to both

of Dr. Jensen's opinions in affording restrictions for simple tasks with limited social contact. *Id*.

He assigned weight to D. Mangold's opinion in limiting plaintiff to simple work in a low contact

setting. *Id*. Finally, he assigned "little overall weight" to Dr. Boehlert's opinion, because although

her opinion was "consistent in certain aspects with the residual functional capacity", Dr. Boehlert

was not "privy to the other evidence of record in conducting her examination," including

plaintiff's self-reporting about her daytime sleepiness. Tr. 20.

Ultimately, the ALJ concluded that, while plaintiff was not able to perform past relevant work, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. Tr. 21. Thus, the ALJ concluded that plaintiff was not disabled. Tr. 22.

## III.    Discussion

The sole issue to be reviewed by this Court is whether the ALJ's decision that plaintiff was not under a disability is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)); *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) ("[substantial evidence] is less than a preponderance of the evidence but more than a mere scintilla"). The ALJ's disability determination must be upheld by this Court even if "substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### A.    Disability Standard

For purposes of both SSI and DIB, a person is disabled when unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

Plaintiff bears the initial burden of showing that the impairment prevents the claimant from returning to his or her previous type of employment. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which plaintiff could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

In order to determine whether plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

(1) whether plaintiff is currently working;

(2) whether plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) whether the impairment prevents plaintiff from continuing past relevant work; and

(5) whether the impairment prevents plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry*, *supra*, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

In order to determine whether an admitted impairment prevents a claimant from performing past work, the ALJ is required to determine plaintiff's RFC and the physical and mental demands of the work that plaintiff has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). RFC is described as "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1). When determining RFC, the ALJ considers "all the relevant evidence in [a claimant's] case record." *Id*.

**B.     Plaintiff's Arguments**

Plaintiff has raised two distinct issues. First, plaintiff argues that the ALJ erred in assessing the plaintiff's credibility regarding her subjective complaints. Dkt. No. 13-1, at 17. She argues that because this credibility analysis was flawed, the ALJ's RFC assessment is not supported by substantial evidence and thus remand is required. Second, plaintiff asserts that the ALJ failed in his duty to develop the record. Dkt. No. 13-1, at 21–27. She raises several perceived gaps in the record. Each of these issues is discussed separately below.

1.     Credibility

The Social Security rulings and regulations provide significant guidance in the process of evaluating a claimant's subjective statements regarding her symptoms.[2] First, an ALJ must determine if the claimant has any medically determinable impairments that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. §§ 404.1529 & 416.929. If a medically determinable impairment is present, the ALJ must then evaluate the intensity and persistence of the claimant's symptoms. § 404.1529(c)(1); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). In making this evaluation, the ALJ must consider several types of evidence, including objective medical evidence and the claimant's reported daily activities.

---

[2] "Symptom" is defined by the agency as "an individual's own description of his or her physical or mental impairment(s)." SSR 96-7p, 61 FR 34483, 34484 (S.S.A. July 2, 1996).

§ 404.1529(c)(2–3). Once this evidence has been considered, the ALJ must determine the extent to which the claimant's symptoms affect her ability to work. §404.1529(c)(4). The ALJ should "evaluate [the claimant's] statements in relation to the objective medical evidence and other evidence" when determining the impact of symptoms on work activities. *Id*. Ultimately, the claimant's statements regarding her symptoms will be reflected in the RFC assessment to the extent that they "can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.; *see also* §§ 404.1529(d)(4) & 404.1545.

In this case, the ALJ concluded that plaintiff lacked credibility. Plaintiff argues that the ALJ's conclusion regarding her credibility was erroneous for several reasons. First, the ALJ improperly considered plaintiff's noncompliance with conservative treatment in assessing credibility. Then, the ALJ improperly assessed plaintiff's daily activities in making a credibility determination. Finally, the ALJ should not have discounted plaintiff's subjective statements concerning her fibromyalgia based on the lack of objective medical evidence.

a.     Noncompliance

Under SSR 96-7p, an ALJ may find a claimant's statements to be less credible if "the level or frequency of treatment is inconsistent with the level of complaints," or if the record shows that "the [claimant] is not following the treatment as prescribed and there are no good reasons for failure." SSR 96-7p, 1996 WL 374186, at *7 (S.S.A. July 2, 1996); *see also Wells v. Colvin*, 87 F. Supp. 3d 421, 432 (W.D.N.Y. 2015) ("Because the medical record shows that Plaintiff was noncompliant with medications and inconsistent in following medical advice even after she was insured and receiving regular treatment by a physician, the ALJ did not err in considering Plaintiff's noncompliance in evaluating Plaintiffs credibility.") (citing SSR 96-7p).

However, before determining any impact on credibility, the ALJ must "consider[] any explanations that the individual may provide . . . that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7.

Plaintiff asserts that the ALJ failed to consider the possibility that plaintiff's mental impairments prevented her from fully complying with recommended treatment. In a recent case, *Cox v. Astrue*, the Northern District of New York noted that "faulting a person with a diagnosed mental illness for failing to pursue mental health treatment is a 'questionable practice.'" 993 F. Supp. 2d 169, 186 (N.D.N.Y. 2012). Thus, the ALJ's credibility analysis was flawed because he did not consider "explanations . . . that may explain infrequent or irregular medical visits . . . ." SSR 96-7p, 1996 WL 374186, at *7.

This Court disagrees with plaintiff's assertion. First, there is no indication in the record that plaintiff's mental health impairments caused her to be noncompliant with treatment and fail to heed medical advice. In fact, the specific reason given by plaintiff in her hearing testimony for failing to take a prescribed medication, methotrexate, was that "she didn't remember what it was for." Tr. 113. Plaintiff candidly admitted that noncompliance with her prescribed treatment was a result of "[her] own stupidity." Tr. 114. Furthermore, in both of the psychiatric consultative examinations plaintiff received, her insight, judgment, memory, and thought processes were noted to be normal, Tr. 366, 692, and the examiner found that her psychiatric problems do not significantly interfere with her ability to function. Tr. 367, 693. These facts differ from those in plaintiff's cited case, *Cox v. Astrue*. In that case, the record contained more concrete indications that a mental health impairment may have caused noncompliance.[3] 993 F.

---

[3] For example, the record in *Cox v. Astrue* included references to psychiatric hospitalizations, 993 F. Supp. 2d at 186, whereas in this case no psychiatric hospitalizations during plaintiff's period of disability appear to be documented. Furthermore, in *Cox*, a consultative examiner noted that the claimant's insight and judgment were "poor", whereas here plaintiff's insight and judgment were normal. *Id.* The *Cox* Court specifically linked poor

Supp. 2d at 186. Thus, the record in the present case suggests that plaintiff's noncompliance was caused by negligence rather than a mental health impairment.

Plaintiff also argues that SSR 02-1p compels the ALJ to disregard the fact that plaintiff failed to treat her obesity through diet and exercise as recommended by her doctors. Dkt. No. 13-1, at 18; *see also* SSR 02-1p, 2002 WL 34686281, at *9 (S.S.A. Sept. 12, 2002) ("The treatment must be prescribed by a treating source . . . not simply recommended. A treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise is not prescribed treatment."). However, SSR 02-1p does not apply in this situation. The directives in SSR 02-1p regarding noncompliance are meant to be considered in the context of 20 C.F.R. §§ 404.1530 & 416.930. *See id.*, at *9. Those regulations provide a separate mechanism for finding a claimant not disabled if noncompliance is the factual cause of the claimant's disability. 20 C.F.R. § 404.1530 ("In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work."). If the ALJ is merely considering noncompliance as a factor in his assessment under § 404.1529 as permitted by SSR 96-7p, he may consider whether plaintiff's failure to engage in diet and exercise to treat her obesity undermined her credibility. SSR 96-7p, 1996 WL 374186, at *7; *Wells*, 87 F. Supp. 3d at 432 (holding that the ALJ did not err in finding that a claimant's failure to follow a diabetic diet suggested by her physicians undermined her credibility because it showed she was "inconsistent in following medical advice"); *Shaw v. Comm'r of Soc. Sec.*, No. 7:11–cv–1463 (GLS), 2013 WL 316616, at *8 (N.D.N.Y. Jan. 28, 2013) (ALJ's § 404.1529 credibility determination was supported by substantial evidence where he found that the claimant was

---

insight and judgment to the notion that the claimant's mental health impairments may have caused her noncompliance. *Id.*

noncompliant with "recommended treatments" for obesity). For these reasons, the ALJ properly considered plaintiff's noncompliance in his credibility assessment.

b.    Daily Activities

Next, plaintiff argues that the ALJ improperly found that her engagement in particular daily activities undermined her credibility. *See* 20 C.F.R. § 404.1529(c)(3)(i). She claims that the ALJ, despite plaintiff's conflicting statements about her daily activities, should have believed the statements made by plaintiff in her hearing. Dkt. No. 13-1, at 20. This Court need not spend much time reviewing this issue. It is explicitly the domain of the ALJ, not this Court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *see also Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. Mar. 24, 2010) (summary order) ("We have no reason to second-guess the credibility finding in this case where the ALJ identified specific record-based reasons for his ruling."). Here, for example, the ALJ found that plaintiff's subjective statements were undermined by her own reports that she "cleans up after her pets and . . . spends her days taking care of her home." Tr. 20, *referring to* Tr. 280. Plaintiff did also state that she was often "too depressed to get up and do what needs to be done," Tr. 280, but this statement is inconsistent with two psychiatric examinations where the physician opined that plaintiff's psychiatric problems do not substantially interfere with her ability to function. Tr. 367, 693. Plaintiff opined in her internal medicine examination that she only bathes once per month, Tr. 697, but treatment notes from April 7, 2014 reveal that she demonstrated ability to maintain her hygiene after urging from her physician. Tr. 1095. Given the discrepancies in plaintiff's statements, and the inconsistencies across the record, this Court has no reason to invalidate the ALJ's factual findings regarding the credibility of plaintiff's testimony concerning her daily activities. *See Brault v. Soc.*

*Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*.") (emphasis original, internal quotation marks omitted).

c.     Fibromyalgia and Chronic Fatigue

Finally, plaintiff argues that the ALJ erred in his credibility assessment with regard to her subjective complaints of pain and fatigue. She claims that, because of her fibromyalgia diagnosis, subjective complaints of pain and fatigue must be given greater deference, because fibromyalgia often presents without objective evidence. Therefore, it was error for the ALJ to rely on objective evidence to discredit plaintiff's subjective complaints regarding her pain and fatigue. Dkt. No. 13-1, at 20–21.

Plaintiff is correct that fibromyalgia frequently presents without objective evidence, and that it would be erroneous to dismiss her subjective complaints purely based on a lack of corroborating objective evidence. *Green-Younger v. Barnhart*, 335 F.3d 99, 109 (2d Cir. 2003) ("[W]e have recognized that in stark contrast to the unremitting pain of which fibrositis[4] patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions."); *Campbell v. Colvin*, No. 5:13–cv–451 (GLS/ESH), 2015 WL 73763, at *6 (N.D.N.Y. Jan. 6, 2015) ("[D]iscrediting treating source medical opinions and subjective testimony concerning limiting effects of fibromyalgia simply because such evidence is not corroborated by objective medical evidence is error."). However, even in cases of fibromyalgia, the ALJ must make a credibility assessment regarding plaintiff's statements about the intensity and persistence of her pain; the ALJ may still consider factors other than objective evidence. In fact, SSR 12-2p, which provides

---

[4] "Fibrositis" is synonymous with "fibromyalgia." *See Green-Younger*, 335 F.3d at 101 n.1.

guidance on evaluating fibromyalgia claims, specifically states that the ALJ may consider "the [claimant's] daily activities," as well as "the nature and frequency of the person's attempts to obtain medical treatment for symptoms." SSR 12-2p, 2012 WL 3104869, at *5 (S.S.A. July 25, 2012). As discussed previously, the ALJ relied heavily on plaintiff's poor attendance at appointments and noncompliance with treatment in assessing credibility. Tr. 20. This finding is supported by substantial evidence in the record. For example, a physical examination revealed that palpitation of the "traditional fibromyalgia areas" elicited significant discomfort, Tr. 883; however, in the same examination, NP Raab opined that plaintiff's attendance at appointments was so inconsistent that it was "difficult to get a good handle on adequate therapies" with regard to her fibromyalgia. Tr. 883.

Furthermore, the ALJ did to some extent modify plaintiff's RFC because of plaintiff's fibromyalgia. Tr. 20 ("To account for the claimant's obesity, fibromyalgia and pulmonary issues, the claimant was limited to light exertional level, with additional limitations for stooping, crouching, kneeling, crawling and climbing."). There are no medical opinions in the record that suggest plaintiff's fibromyalgia demands restrictions beyond those given by the ALJ. Because it is clear that the ALJ did not rely solely on objective evidence in dismissing plaintiff's fibromyalgia related complaints, he did not err in assessing credibility.

As a final matter on the issue of credibility, the ALJ noted that all of plaintiff's subjective complaints were undercut by other statements she made at her hearing. Tr. 20. Plaintiff testified that "she still feels she is ready, willing and able to work," and that "she looks at job advertisements in the newspaper every day." Tr. 20, *referring to* Tr. 86. She further testified to specific jobs she feels she would be able to do, such as "childcare, stuffing envelopes or caring for animals." Tr. 20, *referring to* Tr. 108. Disability is defined as the inability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment," 42 U.S.C. § 423(d). Thus, plaintiff's testimony that she feels able to work quite directly contradicts her claim that she has disabling pain and fatigue. For these reasons, this Court finds that the ALJ's credibility assessment is supported by substantial evidence and must be upheld.

### 2.    Duty to Develop the Record

Plaintiff's second argument revolves around the ALJ's duty to develop the administrative record. It is well-established Second Circuit law that "'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). This duty is a threshold requirement for the SSA; the ALJ must develop the record prior to assessing whether a claimant is disabled. 20 C.F.R. § 404.1512(b)(1) ("[b]efore we make a determination that you are not disabled, we will develop your complete medical history"). The ALJ must fulfill this duty "even when the claimant is represented by counsel." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  In order to discharge the duty, the ALJ should "make every reasonable effort to help [the claimant] get medical evidence from [his] own medical sources and entities that maintain [his] medical sources' evidence . . . ." 20 C.F.R. § 404.1512(b)(1).

However, the ALJ's duty to develop the record "is not unlimited." *Blackman v. Berryhill*, No. 1:16-CV-00869-HBS, 2018 WL 3372963, at *3 (W.D.N.Y. July 11, 2018). Ultimately, it is the claimant's burden to "prove to [the Social Security Administration] that [she is] blind or disabled." 20 C.F.R. § 404.1512(a)(1). In adhering to this responsibility, the claimant must "inform [the Administration] about or submit all evidence known to [her] that relates to whether

or not [she is] blind or disabled." *Id*. Furthermore, if there are no "obvious gaps" in the administrative record, the ALJ "is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999). With this context in mind, two issues arise when the duty to develop the record is challenged: (1) whether there was an "obvious gap" in the record that should have prompted the ALJ to seek additional information; and (2) whether the ALJ fulfilled his duty by making "every reasonable effort" to fill that gap. 20 C.F.R. § 404.1512(b)(1); *Rosa*, 168 F.3d at 79 n. 5; *Blackman*, 2018 WL 3372963, at *3.

Plaintiff presents a two-pronged argument in this regard. First, plaintiff asserts that a gap in the record existed because the ALJ gave "little overall weight" to the opinion of consultative examiner Dr. Boehlert. Second, plaintiff argues that the ALJ failed to develop the record because he did not solicit a medical opinion from plaintiff's primary care doctor. For the following reasons, this Court believes that the ALJ did not fail in his duty to develop the record.

a.    Dr. Boehlert

Plaintiff's first argument is that the ALJ's rejection of the internal medicine consultative examiner's opinion created an evidentiary gap in the record. Other than the opinion of the consultative examiner, there were no other medical opinions regarding plaintiff's physical impairments in the record that the ALJ could rely on. Thus, plaintiff argues, the ALJ must have impermissibly formed the plaintiff's RFC operating under his own lay opinion, given that he had no opinion to rely on after rejecting Dr. Boehlert's. For the following reasons, this Court disagrees with plaintiff's argument.

The Court recognizes that there is a recent line of unreported cases from the District Courts that supports plaintiff's reasoning in this matter. *See Stein v. Colvin*, No. 15-CV-6753-

FPG, 2016 WL 7334760, at *4 (W.D.N.Y. Dec. 19, 2016) ("[T]he ALJ's rejection of the only medical opinion in the record created an evidentiary gap in the record requiring remand."); *Zayas v. Colvin*, No. 15-CV-6312-FPG, 2016 WL 1761959, at *4 (W.D.N.Y. May 2, 2016) (where the ALJ gave "limited weight" to the medical opinions, "[t]he ALJ's rejection of these opinions created an evidentiary gap in the record requiring remand"); *House v. Astrue*, No. 5:11–CV–915 (GLS), 2013 WL 422058, at *4 (N.D.N.Y. Feb. 1, 2013) (holding that where the ALJ rejected the only medical opinion in the record, his RFC assessment was not supported by substantial evidence). Essentially, these cases hold that if the ALJ does not assign significant weight to any opinion in the record, or alternatively assigns "little weight" to all opinions in the record, his RFC assessment must be based on his lay opinion and therefore cannot be supported by substantial evidence.

The composite rule formed by the above cases seems to arise out of First Circuit jurisprudence.[5] In *Manso-Pizarro v. Sec'y of Health and Human Servs.*, the First Circuit held that "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." 76 F.3d 15, 17 (1st Cir. 1996) (quoting *Santiago v. Sec'y of Health and Human Servs.*, 944 F.2d 1, 7 (1st Cir. 1991)). The Court concluded that, because there was no functional capacity analysis by a physician in the record, the ALJ had impermissibly formed an RFC out of bare medical findings. *Id.* at 17–18.

This Court finds that the District Court cases extended *Manso-Pizarro* too far past its holding. First, *Manso-Pizarro* was a case where the record contained no medical opinions at all, 76 F.3d at 17, whereas the District Court cases (including this case) involved a record where the

---

[5] This line of District Court cases seems to trace back to *Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15 (1st Cir. 1996). *Stein v. Colvin* cites to *Zayas v. Colvin*, which in turn cites to *House v. Astrue*, which finally cites to *Manso-Pizarro*.

only medical opinion was given "little weight." This is a significant distinction. In *Manso-Pizzaro*, the ALJ had no medical opinion to work with, which means that his RFC assessment could not possibly have been based on anything other than "raw data." *Id.* at 17–18. In this case, Dr. Boehlert's opinion was in the record, and the ALJ discussed it thoroughly in his decision. Tr. 20. He explained that, while "the overall opinion is consistent in certain respects with the residual functional capacity," he assigned the opinion "little overall weight" because Dr. Boehlert was not privy to other evidence in the record and therefore had to rely heavily on plaintiff's statements which, as stated above, the ALJ found inconsistent. *Id*. Nonetheless, Dr. Boehlert's opinion was clearly incorporated into the ALJ's RFC assessment. For example, in her medical source statement, Dr. Boehlert opined that "[plaintiff] has mild limitation [with] work requiring excellent visual acuity from iritis and scleritis." Tr. 699. This is reflected in the ALJ's RFC assessment. Tr. 14 ("This individual is not suited for work that requires constant very fine visual acuity.").

Furthermore, although Dr. Boehlert's opinion is the only medical opinion regarding plaintiff's physical conditions, there are a total of five medical opinions in the record that the ALJ discussed, four of which concerned her mental conditions. Tr. 18–20. The ALJ considered all of these opinions, and incorporated them into plaintiff's RFC. *See, e.g.,* Tr. 19 ("The opinions and evaluation notes from Dr. Jensen are assigned weight in affording the claimant restrictions for simple tasks with limited social contact."). This ratio of four psychiatric opinions to one internal medicine opinion is reasonable in the context of plaintiff's hearing testimony, because plaintiff opined that her mental health conditions were the most significant in limiting her ability to work. Tr. 88 (ALJ: "I would like you to tell me the biggest problem that you feel that you have which

would interfere with any type of work. What would that be?"; CLMT: "Mostly my mental health.").

Although the Second Circuit has not addressed this issue directly, the case of *Matta v. Astrue* is more analogous to the facts of this case than *Manso-Pizzaro*. *Matta v. Astrue*, 508 F. App'x 53 (2d Cir. Jan. 25, 2013) (summary order). In that case, the record contained four medical opinions. *Id.* at 56. The ALJ referenced all these opinions, but his final RFC assessment did not match any particular opinion. *Id.* Specifically, the ALJ concluded that the claimant's "condition stabilized and at the most, he had moderate symptoms"; however, plaintiff's treating psychiatrist opined that plaintiff had "marked difficulties" in several areas, and a consultative examiner opined that psychiatric conditions "significantly interfere[d]" with the claimant's ability to function. *Id.* The plaintiff asserted that the ALJ substituted his own medical judgment for these expert opinions. *Id.* The Second Circuit held that the ALJ had not erred. The Court found that, "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources in his decision, he was entitled to weigh *all* of the evidence available to make an RFC finding that was consistent with the record as a whole." *Id.* (emphasis added). Likewise, in this case, the ALJ considered all five of the medical opinions in the record. Tr. 18–20. Although his RFC assessment did not "perfectly correspond" with any of these opinions, he "took account of the opinions of all these experts, and the notes of other treatment providers." *Matta*, 508 F. App'x at 56. Therefore, the ALJ in this case, like the ALJ in *Matta*, correctly "weigh[ed] all of the evidence available" and formed an RFC "consistent with the record as a whole." *Id.*

Plaintiff furtherr asserts that the ALJ formed the RFC out of "whole cloth", based only on the ALJ's own assessment of medical evidence and without regard to her subjective complaints or any medical opinion. However, each element in the RFC relating to plaintiff's physical

limitations corresponds with either plaintiff's subjective complaints or with an expert medical source statement. First, the ALJ limited plaintiff to performing "light work as defined in 20 CFR 404.1567(b)." Tr. 13. This is supported by plaintiff's own testimony that she is able to carry a ten-pound cat across a room. Tr. 106; 20 C.F.R. 404.1567(b) ("Light work involves . . . frequent lifting or carrying of objects weighing up to 10 pounds."). Next, the ALJ placed additional limitations for stooping, crouching, kneeling, and climbing stairs. Tr. 13. This is supported by plaintiff's statements in her function report form, where she indicated that she cannot climb stairs, kneel, or squat. Tr. 285. The ALJ further stated that plaintiff should not "work in unventilated work areas that contain large concentrations of dusts, fumes, gases and vapors." Tr. 14. This is supported by plaintiff's testimony that she has difficulty breathing, Tr. 99, which is corroborated by an abnormal pulmonary function test. Tr. 1012. Finally, the ALJ placed a limitation related to visual acuity which, as discussed above, is supported by Dr. Boehlert's medical opinion. Tr. 14.

Furthermore, it was not error for the ALJ to credit some of plaintiff's statements while discrediting others. The ALJ "is required to incorporate only those limitations accepted as credible by the finder of fact," *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993), and has "discretion to evaluate the credibility of a claimant and to arrive at an independent judgment" regarding the extent of her subjective complaints. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). It is within this discretion for the ALJ to credit some, but not all of plaintiff's subjective complaints. *See Barbato v. Astrue*, No. 09–CV–6530T, 2010 WL 2710521, at *5 (W.D.N.Y. July 7, 2010) (holding that the ALJ did not err where he "discounted some of the Plaintiff's subjective complaints . . . because he found that Plaintiff was not entirely credible"); *Petrovic v. Comm'r of Soc. Sec.*, 15 Civ. 2194 (KMK)(PED), 2016 WL 6084069, at

*13 (S.D.N.Y. Aug. 25, 2016) (ALJ did not err where he gave "some weight" to a claimant's subjective complaints, explaining that he "[gave] the benefit of the doubt" to subjective complaints which was consistent with "the claimant's own testimony"). Thus, although plaintiff takes issue with the fact that the ALJ did not find her complaint of daytime sleepiness to be credible, it was in the ALJ's discretion as finder of fact to make that determination. This Court must uphold that determination so long as it is supported by substantial evidence, even if "substantial evidence, or even a preponderance of the evidence, supports the claimant's position." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). As discussed in Part III.B.1., *supra*, the ALJ explained at length why he did not find some of plaintiff's subjective complaints to be credible.

In conclusion, the approach used by the ALJ is consistent with the Social Security regulations. 20 C.F.R. § 404.1545 states that "we will assess your residual functional capacity based on all the relevant evidence in your case record." More specifically, "[i]f your case is at the administrative law judge hearing level . . . the administrative law judge . . . is responsible for assessing your residual functional capacity." 20 C.F.R. § 404.1546(c). Relevant evidence includes both expert medical opinions and "objective medical evidence", which includes "medical signs, laboratory findings, or both." 20 C.F.R. § 404.1513(a)(1). Taken together, this regulatory scheme empowers the ALJ to fulfill his "responsibility" of "assessing [a claimant's] residual functional capacity" by reviewing "all the relevant evidence" which includes "objective medical evidence." Thus, the regulations contemplate that the ALJ may form the RFC, at least in part, by making determinations about the "bare medical findings" independent of an expert medical opinion. The regulations could have been written to require the ALJ to merely adopt an

expert opinion when stating the RFC, but they were not. For these reasons, the ALJ did not create a gap in the record when he assigned "little overall weight" to Dr. Boehlert's opinion.

### b. Primary Care Doctor's Opinion

Plaintiff also asserts that the ALJ failed in his duty to develop the record because he did not contact plaintiff's primary care physician, Dr. Connor, to obtain a medical opinion. Plaintiff argues that "it is incumbent upon the ALJ to obtain a report from the treating physician '[setting] forth the opinion of [the] treating physician as to the existence, the nature, and the severity of the claimed disability.'" *Batista v. Barnhart*, 326 F. Supp. 2d 345, 354 (E.D.N.Y. 2004) (citing *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)). However, *Batista* and *Peed* should not be given weight, as they were decided when the regulations explicitly required the ALJ to recontact a treating physician in light of an incomplete record. 20 C.F.R. § 404.1512(e) (Effective to July 31, 2006) ("When the evidence we receive from your treating physician . . . is inadequate . . .[w]e will first recontact your treating physician . . . ."). This regulation was amended in 2012 to "delete the provision that imposed a duty to recontact a treating physician." *Mura v. Colvin*, No. 16-CV-6159P, 2017 WL 2543939, at *4 n. 5 (W.D.N.Y. June 13, 2017). Under the new standard, the ALJ is permitted to take several different actions to cure an incomplete record: recontact a medical source, request additional existing evidence, request a consultative examination, or ask the claimant or "others" for more information. 20 C.F.R. § 404.1520b(b)(2). It is specifically stated that the ALJ "might not take all of the actions listed." *Id*. In this case, the ALJ did comply with the standard in § 404.1520b(b)(2) because, although he did not contact plaintiff's primary care physician for a medical opinion, he requested three consultative examinations. Tr. 364, 690, 695. Given the five total medical opinions in the record that were obtained, and the plethora of treatment notes from all of plaintiff's physicians, there is

no indication that there were "obvious gaps" in the record that would have prompted the ALJ to seek additional evidence from plaintiff's primary care doctor. For these reasons, the ALJ did not fail in his duty to develop the record.

**IV.   Conclusion**

Substantial evidence supports the ALJ's findings regarding plaintiff's RFC. The ALJ committed no legal error in his decision. For these reasons, plaintiff's motion for judgment on the pleadings (Dkt. No. 13) is DENIED and defendant's cross-motion (Dkt. No. 16) is GRANTED. The Clerk of the Court shall close this case.

SO ORDERED.

_/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: August 15, 2018